UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| AMY DAWON FLAH, | Case No. 14-CV-0264 (PJS/FLN) |
| Plaintiff, | |
| v. | ORDER |
| THE CITY OF MAPLE GROVE and DAVID HACKLEY, an individual officer of the City of Maple Grove sued in his individual capacity, | |
| Defendants. | |

---

Brandon McDonough and Nicholas Nowicki, MCDONOUGH & NOWICKI PLLC, for plaintiff.

Brian P. Taylor, Jason M. Hiveley, and Jon K. Iverson, IVERSON REUVERS CONDON, for defendants.

On September 26, 2013, Kim and Roland Pickner showed up at the apartment of plaintiff Amy Dawon Flah to repossess her car. A dispute arose, the situation escalated, and the Pickners called 911. Officer David Hackley responded. Hackley ultimately pointed his gun at Flah, placed her in handcuffs, arrested her, and gave the Pickners a key to her car. Flah now sues Hackley and his employer, the City of Maple Grove ("Maple Grove"), for alleged violations of her civil rights. All parties have moved for summary judgment. For the reasons that follow, the Court denies Flah's motion and grants in part and denies in part defendants' motion.

I. BACKGROUND

Flah bought a Dodge Charger on credit.  ECF No. 1 (Compl.) ¶¶ 31-34.[1]  She made payments on the loan for a year, but fell behind when she stopped working a second job.  *Id.* ¶¶ 38-41.  After attempts to refinance the loan were unsuccessful, Flah's lender hired the Pickners to repossess her car.  *Id.* ¶¶ 43, 46-47.

Shortly before 10:00 p.m. on Thursday, September 26, 2013, the Pickners drove their tow truck to Flah's apartment building in Maple Grove, Minnesota.  *Id.* ¶¶ 20, 30, 51.  Kim knocked on the door to Flah's apartment and tried to talk to her about the repossession; according to Flah, Kim falsely claimed to be a police officer.  ECF No. 58-2 (Flah Dep.) 171:19-177:5.  Flah and Kim argued, and eventually the two women and Roland ended up in the underground parking garage below Flah's apartment building where the car was parked.  *Id.* at 163:18-19, 178:1-179:13, 193:16-202:18.

Flah confronted the Pickners and told them that they did not have the right to be in the garage.  *Id.* at 220:20-23, 224:18-225:4.  The confrontation escalated into a physical altercation, the details of which are disputed.  In the end, Flah left to return to her apartment, carrying a printer that she had retrieved from the trunk of her car.  *Id.* at 251:11-17, 256:7-9.

---

[1]In their brief, defendants rely on some of the allegations in Flah's complaint. *See* ECF No. 57 at 2-5.  The Court therefore treats those allegations as uncontested for purposes of ruling on the summary-judgment motions.

Meanwhile, Roland called 911.  He told the dispatcher that Flah had shoved and slapped his wife and that Flah had said that she had a gun in her apartment.  ECF No. 64 (McDonough Aff.) Ex. 3 at 0:25-44, 2:05-52, 3:20-26.  (Flah maintains that she said nothing about a gun.  Flah Dep. 252:11-254:20.)  Hackley was dispatched to the scene and was told by the dispatcher that "there was an assault in progress . . . stemming from a repossession" and that "the suspect had gone upstairs to retrieve a gun . . . ."  ECF No. 58-3 (Hackley Dep.) 15:8-17:14.

Hackley arrived at the underground garage just moments before Flah emerged from the stairway connecting the garage to the apartments.  A video camera in the garage captured the ensuing encounter—though incompletely, as the action at times spills outside of the frame.  ECF No. 58 (Hiveley Aff.) Ex. 4 at 2:25-4:44.  The video recording shows Flah walking into the garage through the stairway door with her keys in one hand and her cell phone in the other.  (Flah was in the process of calling 911 herself.  Flah Dep. 258:814, 260:21-261:4.)  Roland points at Flah, and Hackley quickly strides towards her, draws his handgun, and seems to yell commands.  (The camera recorded only images, not sound.)  Flah throws up her arms to shield her face and falls back in a sitting position. With his gun still trained on Flah, Hackley slaps at her hands with his free hand and turns her onto her stomach.  This causes the pair to move mostly outside of the camera's view; after that, it is difficult to make out what is happening.

The video does capture the Pickners, who are watching the confrontation between Hackley and Flah. At one point, Roland walks away from Hackley with an object in his hand; shortly thereafter, Flah's car drives out of the garage. Hackley pulls Flah to her feet and then out of the garage. Flah is in handcuffs.

Hackley and Flah dispute the aspects of their encounter that were not captured on video. Flah asserts that, after the pair moved off camera, Hackley continued to keep his gun trained on her. She claims that Hackley held his weapon in one hand and managed to handcuff her with his other hand. Flah Dep. 267:18-20, 268:18-269:19, 372:18-25. Hackley says that he holstered his gun before he touched Flah. Hackley Dep. 27:4-25, 37:12-38:2, 65:5-66:2. Flah also maintains that Hackley "stepped on [her] back," though she concedes that this "[m]ight have been" an accident. Flah Dep. 377:1-19. Hackley says that his leg did not touch her. Hackley Dep. 40:8-12. Flah says that, while she was on the ground, Roland asked Hackley for Flah's car key, and that, in response, Hackley took the car key off of her key ring and gave it to Roland. Flah Dep. 378:15-25. Hackley concedes that he gave the car key to Roland and says that he has "no clue" why he did so: "I was just picking stuff up and trying to control Ms. Flah. I guess [Roland] was the closest person standing next to me." Hackley Dep. 52:10-22, 54:25-55:3.

Hackley also maintains that Flah grabbed and kicked him—and stated as much in his written police reports. *Id.* at 28:4-11; ECF No. 64-2 at 12, 37.[2] Hackley's reports led to Flah being charged with obstructing and interfering with a police officer in violation of Minn. Stat. § 609.50, subd. 1(2). ECF No. 64-2 at 2. Flah was also charged with assault and disorderly conduct. *Id.* Apparently, all charges against Flah were later dismissed.

Flah brought this lawsuit against Hackley and Maple Grove (as well as other parties—including the Pickners—who have since been dismissed). Flah claims (1) that Hackley and Maple Grove deprived her of property without due process by giving her car key to Roland; (2) that Hackley used excessive force by pointing his gun at her; and (3) that Hackley fabricated evidence to support the obstruction charge.[3] Hackley and Maple Grove deny that any of Flah's rights were violated. Hackley also argues that he is entitled to qualified immunity, and Maple Grove argues that, even if Flah's rights were violated, Maple Grove cannot be held liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

II. ANALYSIS

---

[2]Flah alleges in her complaint that she did not grab or kick Hackley, Compl. ¶ 354, but she apparently was never directly asked in her deposition whether she had done so.

[3]The excessive-force and fabrication-of-evidence claims were originally brought against Maple Grove as well, but Flah has stipulated to the dismissal of those claims against Maple Grove. ECF No. 63 at 2, 30, 34.

*A. Standard of Review*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

Qualified immunity protects a government official from personal liability in a 42 U.S.C. § 1983 action unless the official's conduct violated a clearly established constitutional or statutory right. *Winslow v. Smith*, 696 F.3d 716, 730 (8th Cir. 2012) (citing *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009)). Whether an official is entitled to qualified immunity depends on two questions: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* at 730-31 (citing *Brown*, 574 F.3d at 496). The court may address the questions in any order, but the official will be found immune unless both questions are answered "yes." *Id.* at 731 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012)). When a party moves for summary

judgment on the ground of qualified immunity, "[t]he party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *Id.* at 730 (citing *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008)).

### B. Deprivation of Property

Flah first claims that Hackley deprived her of property (her car) without due process when he intervened in the Pickners' repossession attempt—in particular, when he handed her car key to Roland. It is "well-established" that a police officer may deprive someone of property without due process in violation of the Fourteenth Amendment if that officer significantly intervenes in a private dispute and coerces or encourages one private party to take the property of another. *Moore v. Carpenter*, 404 F.3d 1043, 1046 (8th Cir. 2005) (per curiam); *see also Blum v. Yaretsky*, 457 U.S. 991, 1002-05 (1982). In the context of private repossession of property, a police officer's intervention is deemed state action "if the officer affirmatively intervenes to aid the repossessor enough that the repossession would not have occurred without the officer's help." *Moore*, 404 F.3d at 1046. In other words, whether a police officer violates due process by intervening in a private repossession depends on "whether the repossession would not have occurred but for [the officer's] assistance." *Id.*; *see also Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 610 (3d Cir. 2011); *Marcus v. McCollum*, 394 F.3d 813, 819 (10th Cir. 2004). In short, at the time of the encounter between Hackley and Flah, the

law was clearly established that Hackley would be deemed to have taken Flah's car without due process if he intervened in the Pickners' repossession attempt and if, but for that intervention, the Pickners would not have succeeded at repossessing the car.

Hackley does not deny that he gave Flah's car key to Roland.[4]  The question thus becomes whether the Pickners would have been able to take Flah's car had Hackley not given them Flah's key.  Somewhat surprisingly, the parties paid little attention to this issue, either in discovery or in briefing their summary-judgment motions.  As a result, the record contains almost no evidence about whether the Pickners could have taken Flah's car without Hackley's help.  For example, it is not clear whether the Pickners' tow truck would have fit through the garage's entrance, whether the Pickners would have been able to hook Flah's car up to the tow truck, or whether the tow truck would have been able move Flah's car out of the garage.  These factual disputes preclude summary judgment—one way or the other—on Flah's due-process claim against Hackley.

Flah also seeks to hold Maple Grove liable for Hackley's deprivation of her property because, she says, Maple Grove failed to properly train Hackley about the constitutional restraints that apply to the conduct of law-enforcement officers during private repossessions.  Municipalities cannot be held vicariously liable under § 1983. *Connick v. Thompson*, 131 S. Ct. 1350, 1359-60 (2011) (citing *Monell v. Dep't of Soc. Servs.*,

---

[4]The key is itself property of at least nominal value, but Flah's due-process claim is not based on the deprivation of her key, but rather on the deprivation of her car.

436 U.S. 658, 691-92 (1978)). A municipality can be held liable for failing to train only when that failure amounts to "deliberate indifference" to the rights of others. *Id.* at 1359-60 (citing *City of Canton v. Harris*, 489 U.S. 378. 388 (1989)). The deliberate-indifference standard is a "stringent" one; it is not an invitation for courts to "micromanage local governments," *id.* at 1360, 1363, or to engage in "second-guessing municipal employee-training programs," *Canton*, 489 U.S. at 392. Rather, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. . . . Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 131 S. Ct. at 1360 (quotation omitted).

In essence, Flah claims that, although Maple Grove provided general training on "civil stand bys," that training failed to address particular scenarios of violence or suspected criminal activity that might arise during private repossessions.[5] When pressed at oral argument, however, Flah could point to no evidence that there had been a pattern of unconstitutional entanglements in repossessions in Maple Grove prior to

---

[5]Hackley had taken a course on "civil stand bys" (which include repossessions); during the training, he had been instructed "not to interject in what's going on" and to just "keep the peace." Hackley Dep. 69:2-16; ECF No. 64-3 (Hamann Dep.) 17:4-6. Maple Grove does not train its officers specifically on how to respond to private repossessions that give rise to criminal conduct. Hamann Dep. 18:15-19:7, 21:10-14.

the events that gave rise to this case. Indeed, Flah is unaware of *any* instance of a Maple Grove police officer violating the Constitution in the course of a private repossession. The failure to provide the specific training described by Flah thus falls far short of deliberate indifference.

For these reasons, the Court grants summary judgment to Maple Grove on Flah's claim of deprivation of property and denies summary judgment to Hackley and to Flah on that claim.

### C. *Excessive Force*

Flah next claims that Hackley used excessive force when he kept his gun pointed at her for longer than was reasonable. A police officer's use of excessive force in the course of seizing a person violates the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Chambers v. Pennycook*, 641 F.3d 898, 905 (8th Cir. 2011). The degree of force employed is excessive if it is objectively unreasonable under the circumstances. *Graham*, 490 U.S. at 396; *Chambers*, 641 F.3d at 905-06. Although the Court and the parties were unable to identify Eighth Circuit precedent addressing the issue directly, case law from other circuits suggests that pointing a gun at a suspect—in and of itself—can violate the Fourth Amendment under some circumstances. *See, e.g., Mlodzinski v. Lewis*, 648 F.3d 24, 38 (1st Cir. 2011); *Baird v. Renbarger*, 576 F.3d 340, 344-47

(7th Cir. 2009); *Robinson v. Solano Cty.*, 278 F.3d 1007, 1013-15 (9th Cir. 2002) (en banc); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1192-93 (10th Cir. 2001).[6]

For example, once a police officer determines that a suspect does not pose an immediate threat, continuing to aim a weapon at the suspect may constitute excessive force. *Holland*, 268 F.3d at 1192-93 ("Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use."); *see also Robinson*, 278 F.3d at 1013-15 (holding that claim of "officers' use of a drawn gun pointed at [the suspect]'s head from close range" adequately alleged excessive force, when suspect clearly no longer had shotgun he had reportedly used to shoot his neighbor's dogs). Pointing a gun at someone is, of course, not an *actual* use of force, but instead a *threatened* use of force—a threat that might result in emotional distress. *See Robinson*, 278 F.3d at 1015 (agreeing that "a police officer who terrorizes a civilian by brandishing a cocked gun in front of that civilian's face may not cause physical injury, but he has certainly laid the building blocks for a section 1983 claim against him" (quotation marks, alteration, and

---

[6]The fact that the Eighth Circuit has not ruled on the issue does not mean that the right has not been clearly established. *See Johnson-El v. Schoemehl*, 878 F.2d 1043, 1049 (8th Cir. 1989).

citation omitted)); *Holland*, 268 F.3d at 1192 ("The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force.").

Hackley had been told by the dispatcher that an assault was in progress and that Flah had left to retrieve a gun. Thus, when Flah appeared suddenly in the garage, Hackley acted reasonably in training his gun at her until he could be sure that she was not armed and did not pose a danger to his safety or the safety of the Pickners. At some point, however, Hackley should have been able to make this determination, and at that point he should have stopped pointing his gun at Flah.

It is not clear from the record at what point Hackley determined (or should have determined) that Flah was not armed, nor is it clear whether Hackley continued to point his gun at Flah after making that determination. Two things are clear, however: First, Hackley could not have reasonably determined that Flah did not pose a danger until she was lying facedown on the pavement, which occurred just seconds after she entered the garage. Second, if Hackley continued to aim his gun at Flah after that point, she was unaware of it.

To elaborate on this latter point: Flah testified that, as soon as Hackley moved towards her, she closed her eyes and put her hands in front of her face. Flah Dep. 261:16-19, 262:9-12, 266:2. After that, Hackley turned her around until she was facedown on the ground. Although Flah now *suspects* that Hackley kept his gun in one

hand while he turned and handcuffed her with the other hand, at the time she could not see the gun and had no way of knowing whether it was aimed at her. *Id.* at 268:18-269:19, 372:18-25. Indeed, she admits that the last time she saw the gun was when Hackley approached her and turned her around:

> Q. At what point did you no longer see a gun?
>
> A. When I—when he—after he cuffed me and sat me up. I—I was facedown, so I didn't see where his weapon was. And after—the last time I seen the weapon was when he came and he forcefully turned me around. *And then I didn't see a weapon again after that.* When I sat up he had already put his weapon away.

*Id.* at 269:5-12 (emphasis added).

The only inkling to the contrary is found in Flah's statement that while she was still on the ground she "looked up, [and] it was like—just—he slide [sic] the gun over me." *Id*. at 267:18-20. But that cryptic statement does not establish that she saw the gun *pointed at her* or erase her crystal-clear testimony that she last saw the gun when Hackley approached her and turned her so that she was facedown on the pavement. Moreover, Kim Pickner's written statement to the police that Hackley "put [Flah] on the ground at gun point" is entirely consistent with Hackley's testimony that he aimed his gun at Flah only until he reached her and turned her around. ECF No. 64-2 at 29.

As described above, courts have found that a police officer can violate the Fourth Amendment by employing the threat of deadly force that is implicit in pointing a gun at

someone. But if that person does not *know* that a gun is pointed at her, she cannot possibly perceive "the immediate threat of deadly force," nor can she be "terrorize[d]." *Holland*, 268 F.3d at 1192; *Robinson*, 278 F.3d at 1015. Flah's Fourth Amendment rights were therefore not violated.[7]

Even if the Court is incorrect, Hackley would be entitled to qualified immunity. It would not have been clear to a reasonable officer in Hackley's position that pointing a gun at someone who does not *know* that the gun is pointed at her violates the Fourth Amendment. Indeed, to the best of the Court's knowledge, no court has ever so held. The Court therefore grants summary judgment to Hackley on Flah's excessive-force claim.

### D. Fabrication of Evidence

Finally, Flah claims that Hackley fabricated evidence to support the obstruction charge brought against her. It is "clearly established" that "the Fourteenth Amendment's guarantee of due process is violated by 'the manufacture of . . . false evidence' in order 'to falsely formulate a pretense of probable cause.'" *Livers v. Schenck*, 700 F.3d 340, 354 (8th Cir. 2012) (quoting *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002) (en banc)). Hackley wrote in his reports that Flah grabbed and kicked him in

---

[7]Flah's allegation that Hackley "stepped on [her] back" falls short of excessive force on its own, especially in light of her concession that it "[m]ight have been" an accident and the lack of any evidence that, if it did happen, it was intentional. Flah Dep. 377:1-19.

support of the charge that Flah had obstructed and interfered with a police officer in violation of Minn. Stat. § 609.50, subd. 1(2). ECF No. 64-2 at 12, 37. (The Minnesota statute, as interpreted by the Minnesota courts, "prohibits only intentional physical obstruction or interference." *State v. Krawsky*, 426 N.W.2d 875, 878 (Minn. 1988).) Flah says that Hackley lied. The video recording does not settle the dispute; in the recording, Flah's feet are visible during most of the incident—and she does not kick Hackley during that time—but the recording does not capture the entire incident.

The jury will have to decide what happened and if Hackley lied in his police reports. Accordingly, the Court denies Hackley's summary-judgment motion as to Flah's fabrication-of-evidence claim.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The motion for summary judgment of defendants David Hackley and the City of Maple Grove [ECF No. 55] is GRANTED IN PART AND DENIED IN PART AS FOLLOWS:

    a. The motion is GRANTED as to Flah's claims for deprivation of property against Maple Grove and excessive force against Hackley, and those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

   b.  The motion is DENIED in all other respects.

 2. The motion for partial summary judgment of plaintiff Amy Dawon Flah [ECF No. 61] is DENIED.

 3. Pursuant to Flah's stipulation [ECF No. 63 at 2, 30, 34], the claims for excessive force and fabrication of evidence against Maple Grove are DISMISSED WITH PREJUDICE AND ON THE MERITS.

Dated:  November 19, 2015       s/Patrick J. Schiltz
                 Patrick J. Schiltz
                 United States District Judge